964 A.2d 312

CAMIE LIVSEY, PLAINTIFF–RESPONDENT, v. MERCURY
INSURANCE GROUP, DEFENDANT–APPELLANT.

Argued September 9, 2008—Decided February 19, 2009.

*Susan Stryker* argued the cause for appellant.

*Harvey H. Rothman* argued the cause for respondent (*Gerald Poss*, attorneys).

*Phillip C. Wiskow* submitted a brief on behalf of amicus curiae Association of Trial Lawyers of America–New Jersey (*Gelman Gelman Wiskow & McCarthy*, attorneys).

*Marc L. Dembling* submitted a brief on behalf of amici curiae American Insurance Association, Property Casualty Insurers Association of America, Insurance Council of New Jersey and National Association of Mutual Insurance Companies (*Methfessel & Werbel*, attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal presents a discrete issue involving the interplay, if any, between uninsured motorist (UM) coverage and personal injury protection (PIP) coverage in the context of an insured injured in a drive-by shooting, but who at the time was not operating her own vehicle. The insurance carrier denied the insured's UM claim, and the insured filed a declaratory judgment action. The trial court concluded that, unlike PIP coverage, UM coverage does not extend to victims of random drive-by shootings, reasoning that there was an insufficient relationship between the claimed use of an uninsured vehicle and the injury she suffered. The Appellate Division reversed, concluding that it "perceive[d] no principled basis in these circumstances, a random, drive-by shooting, for treating UM coverage differently from PIP coverage on the central question of whether there was a sufficient nexus between the use of the automobile and the injury." *Livsey v. Mercury Ins. Group*, 396 *N.J.Super.* 373, 377–78, 934 *A.2d* 61 (App.Div.2007), *certif. granted*, 194 *N.J.* 267, 944 *A.2d* 28 (2008).

There are fundamental differences between the PIP statute and the UM statute sufficient to bar the importation of the extent of PIP coverage in the context of a drive-by shooting to a UM coverage question. Also, because the insured's injuries from the drive-by shooting were not causally connected to the insured's use of her motor vehicle, we reverse the judgment of the Appellate Division and reinstate the trial court's judgment in favor of the insurer.

## I.

The facts in this appeal are sparse.[1] At approximately 3:15 p.m. on February 21, 2005, plaintiff Camie Livsey had made a purchase at a grocery store at Ellis Avenue and Hopkins Street in Irvington, and was returning to her car. The police report succinctly summarized the events as follows:

---

[1] This appeal arises in the context of a motion for summary judgment. We, therefore, "view the facts in the light most favorable to plaintiff." *Sciarrotta v. Global Spectrum*, 194 *N.J.* 345, 348, 944 *A.2d* 630 (2008) (citing *Daidone v. Buterick Bulkheading*, 191 *N.J.* 557, 560 n. 1, 924 *A.2d* 1193 (2007); *Soto v. Scaringelli*, 189 *N.J.* 558, 564, 917 *A.2d* 734 (2007)).

> [Plaintiff] states that as she exited 62 Ellis Avenue approaching her vehicle to enter it she was shot in the area of her lower back. [Plaintiff] states that she did not hear or see anything. [Plaintiff] was transported to University Hospital. [Plaintiff] was seen by [a doctor at] University Hospital [who] told [the police officers] that [plaintiff] was shot through her front abdomen and that the bullet exited her left lower back area. The doctor also stated that [plaintiff] was in a critical, but stable condition. The area [of the shooting] was checked for shell casings, but the result was negative. Two witnesses on the scene stated that they saw an older model Toyota Camry fleeing the scene, unknown on the direction of flight. [Plaintiff's] personal items ... were placed into evidence and turned over to the Detective Bureau.

Whether the shot that struck plaintiff in fact came from the unidentified fleeing Toyota or, for that matter, who fired the shot never was discovered nor established.

Plaintiff filed a UM claim with her own automobile insurance carrier, defendant Mercury Insurance Group.[2] According to plaintiff's later declaratory judgment complaint, plaintiff's UM claim was denied by defendant "on the grounds that there was 'no accident that involved an uninsured motor vehicle.'" In filing her complaint, plaintiff alleged that her insurance policy with defendant "will apply when the bodily injury is caused by an accident arising out of the ownership, maintenance or use of an uninsured motor vehicle." Plaintiff claimed that "[t]he very term 'drive-by shooting' was coined to refer to shooters, usually gang members, firing at members of the public from motor vehicles" and that "[t]his term alone implies a substantial nexus between the vehicle and the shooting." She further alleged that "[i]t was within the reasonable expectations of the plaintiff that in this day and age

---

2 The complaint refers to defendant as "Mercury Insurance *Company.*" Only plaintiff uses that designation; all other parties and amici refer to defendant as "Mercury Insurance *Group*" and it is that latter name which is used for defendant in this Court.

and especially in known high crime areas, that a drive-by shooting could be a natural and probable incident of the use of an automobile by an uninsured motorist." Based on that reasoning, plaintiff sought a declaration that defendant was obliged contractually "to provide uninsured motorist coverage to the plaintiff."

After the discovery deadline expired, both plaintiff and defendant moved for summary judgment. On the return date of those cross-motions, the trial court focused on the provisions of the UM statute, which provides coverage for injuries for which an insured "shall be legally entitled to recover as damages from the operator or owner of a motor vehicle ... because of bodily injury ... sustained by the insured, *caused by accident and arising out of the ownership, maintenance, operation or use of such uninsured ... motor vehicle* [.]" *N.J.S.A.* 17:28–1.1(a)(2) (emphasis supplied). Reasoning that the UM statute requires proof of both an "accident" and that such "accident" arose out of the use or ownership of an uninsured motor vehicle, the trial court concluded that "[t]here [was] no substantial connection" between plaintiff's injuries and the ownership, maintenance, operation or use of an uninsured motor vehicle. It therefore granted defendant's motion for summary judgment and denied plaintiff's cross-motion for summary judgment.

Plaintiff appealed and, in a published decision, the Appellate Division reversed and remanded the case for trial. *Livsey, supra,* 396 *N.J.Super.* at 378, 934 *A.*2d 61. According to the panel, "the UM statute serves two purposes: 'to provide maximum remedial protection to the innocent victims of financially irresponsible motorists, and to reduce the drain on the financially-troubled Unsatisfied Claim and Judgment Fund.'" *Id.* at 376, 934 *A.*2d 61 (quoting *Shaw v. City of Jersey City,* 174 *N.J.* 567, 577, 811 *A.*2d 404 (2002)). Relying, in large measure, on a case that interpreted the PIP statute and *not* the UM statute, the panel stated that "PIP liability depended on there being a 'substantial nexus' between the accident and the use of the automobile[;]" that "PIP coverage applied to intentional as well as negligent acts[;]" and

that "the 'act causing injury need not be actually foreseen but it must be both a reasonable consequence of the use of an automobile and one against which the parties would expect protection.' " *Id.* at 377, 934 *A.*2d 61 (quoting *Lindstrom v. Hanover Insurance Co.*, 138 *N.J.* 242, 250, 649 *A.*2d 1272 (1994)). The panel then concluded as follows:

> We perceive no principled basis in these circumstances, a random, drive-by shooting, for treating UM coverage differently from PIP coverage on the central question of whether there was a sufficient nexus between the use of the automobile and the injury. The role played by the automobile in this case is no different from the role it played in *Lindstrom*, and we perceive no basis for concluding that there would be any difference between the objectively-reasonable coverage expectations under either statute, particularly since both statutes are to be construed broadly, extending coverage whenever reasonable.
>
> [*Id.* at 377–78, 934 *A.*2d 61.]

Tellingly, the panel "recognize[d] that over two decades ago another panel reached a contrary conclusion on the availability of UM benefits in a random, drive-by shooting." *Id.* at 378, 934 *A.*2d 61 (citing *Sciascia v. Am. Ins. Co.*, 183 *N.J.Super.* 352, 443 *A.*2d 1118 (Law Div.1982), *aff'd o.b.*, 189 *N.J.Super.* 236, 459 *A.*2d 1198 (App.Div.1983)). It noted that the *Sciascia* court "denied coverage for two reasons: because the accident could not be considered as having arisen out of the use of a vehicle, and because any expectation of coverage was not objectively reasonable." *Ibid.* It reasoned, however, that "[s]ince those conclusions are inconsistent with the Supreme Court's conclusions in *Lindstrom* and *Shaw*, [it was] obliged to reject *Sciascia.*" *Ibid.*

We granted defendant's petition for certification, *Livsey v. Mercury Ins. Group*, 194 *N.J.* 267, 944 *A.*2d 28 (2008), in order to determine whether "a drive-by shooting constitute[s] an 'accident' arising out of the 'ownership, maintenance, operation or use' of an automobile, entitling the victim to statutorily-mandated uninsured motorists benefits under *N.J.S.A.* 17:28–1.1(a)(2).' " We also granted amicus curiae status to the American Trial Lawyers Association–New Jersey (ATLA–NJ) [3] and, jointly, to the Ameri-

---

[3] Effective January 1, 2009, this organization was renamed the "New Jersey Association for Justice." *See* 195 *N.J. Law J.* 20 (Jan. 5, 2009).

can Insurance Association, the Property Casualty Insurers Association of America, the Insurance Council of New Jersey, and the National Association of Mutual Insurance Companies (the Insurance Trade Groups).

## II.

Defendant asserts that the Appellate Division's decision—which extended UM coverage to drive-by shooting victims—"is contrary to law and constitutes an unwarranted expansion of benefits under the UM statute and the subject policy." It claims that drive-by shooting injuries are not a reasonable consequence of an automobile's use and that coverage for such injuries is not within the reasonable contemplation of the parties. It notes that there are fundamental differences between the PIP statute and the UM statute, and it claims that the Appellate Division has blurred those differences. It also claims that the panel's conclusions are unsupported in the record.

In response, plaintiff argues that a drive-by shooting qualifies for UM coverage under the terms of the UM statute; in plaintiff's view, "a drive-by shooting constitutes an 'accident' arising out of the 'ownership, maintenance, operation or use' of an automobile, entitling the victim to statutorily-mandated uninsured motorist benefits under *N.J.S.A.* 17:28–1.1(a)(2)." She asserts that this Court already has held that the UM statute's history commands that it be interpreted as providing coverage coextensive with what is available under the Unsatisfied Claim and Judgment Fund Law, *N.J.S.A.* 39:6–61 to –90. She further urges that there is a sufficient nexus between a drive-by shooting and the use of an automobile to trigger UM coverage.

ATLA–NJ squarely supports the Appellate Division's decision below. It argues singularly that "[t]he Appellate Division correctly applied the holdings of this Court in *Lindstrom* ... and *Shaw* ... and its decision should be affirmed."

The Insurance Trade Groups mount a three-pronged assault on the Appellate Division's decision. First, they claim that "[t]here is

no insurance coverage for a random drive-by shooting under the uninsured motorist provisions of the statute because there is no proof of the liability of the owner or operator of the uninsured motor vehicle." Second, they assert that, in the circumstances presented, there is no UM coverage "because the uninsured motor vehicle was not the instrumentality of the injury." Finally, they urge that "[t]here is no substantial evidence in the record to sustain a finding that the random shooting arose out of the ownership, maintenance, operation or use of an uninsured motor vehicle."

### III.

This appeal requires that we interpret *N.J.S.A.* 17:28–1.1(a)(2) and determine whether UM coverage extends to injuries suffered as a result of a drive-by shooting. In that task we are guided by core principles of statutory construction. We have explained that

> when interpreting a statute, our overarching duty is to construe and apply the statute as enacted. We do so by applying the following principles. First, a court should not resort to extrinsic interpretative aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation. That said, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction. We have explained that we may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language. We are guided by first principles: our analysis begins with the plain language of the statute.
>
> [*In re Liquidation of Integrity Ins. Co.*, 193 *N.J.* 86, 94, 935 *A.*2d 1184 (2007) (quoting *Daidone v. Buterick Bulkheading*, 191 *N.J.* 557, 565–66, 924 *A.*2d 1193 (2007) (citations, internal quotation marks and editing marks omitted)).]

In so doing, our guidepost is clear: "words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language." *Ibid.* (quoting *Soto v. Scaringelli, supra*, 189 *N.J.* at 570–71, 917 *A.*2d 734 (internal quotation marks omitted)). *See also N.J.S.A.* 1:1–1 (providing that "[i]n the construction of the

laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language" while "[t]echnical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning.").

■ On its face, *N.J.S.A.* 17:28–1.1(a)(2) appears clear; it provides, in relevant part, that

no motor vehicle liability policy or renewal ... insuring against loss resulting from liability imposed by law for bodily injury or death, sustained by any person arising out of the ownership, maintenance or use of a motor vehicle, shall be issued in this State with respect to any motor vehicle registered or principally garaged in this State unless it includes coverage in limits for bodily injury or death as follows:

...

(2) an amount or limit ... for payment of all or part of the sums which the insured or his legal representative shall be legally entitled to recover as damages from the operator or owner of an uninsured motor vehicle, or hit and run motor vehicle ... because of bodily injury, sickness or disease, including death resulting therefrom, sustained by the insured, *caused by accident and arising out of the ownership, maintenance, operation or use of such uninsured or hit and run motor vehicle* anywhere within the United States or Canada[.]

[ (Emphasis supplied).]

Thus, an insured who seeks UM benefits must satisfy a two-prong test: first, the insured must demonstrate that his or her injuries were caused by an "accident;" and, second, the insured must prove that the accident arose from the ownership, maintenance, operation or use of an uninsured vehicle. We address those elements in order.

■ New Jersey courts consistently have held that the determination of whether an incident or an event qualifies as an "accident" under the UM statute is to be gauged from the perspective of the insured/victim, and not of the tortfeasor. Starting with *Sciascia, supra,* and continuing through *Shaw, supra,* our courts have embraced the concept that, in the context of UM coverage, "[e]xtending uninsured motorist coverage irrespective of whether

the insured's injury was caused by an intentional act maximizes the scope of the protection available under *N.J.S.A.* 17:28–1.1, thereby giving effect to its legislative intent." *Shaw, supra,* 174 *N.J.* at 575, 811 *A.*2d 404;[4] *accord Abraham v. Raso,* 183 *F.*3d 279, 296–97 (3d Cir.1999) (predicting that Supreme Court of New Jersey "would hold that what counts as an accident for the purposes of uninsured motorist insurance should be judged from the victim's perspective"). Viewed through that prism, there can be little doubt that plaintiff's injury—being struck by a bullet from a drive-by shooting—qualifies as an "accident" under the UM statute. Thus, the only question remaining is whether there was a sufficient nexus between the accident and the ownership, maintenance, operation or use of an uninsured vehicle.

It is in this respect that we must part company with the Appellate Division. The UM statute is clear: in order to trigger UM coverage, the accident must be one *"arising out of* the ownership, maintenance, operation or use of such uninsured ... motor vehicle[.]" *N.J.S.A.* 17:28–1.1(a)(2) (emphasis supplied). Plainly, that was not the case here.

As the starting point for its analysis, the Appellate Division relied on cases that interpreted the PIP statute in order to provide coverage in the case of a drive-by shooting; having established that PIP coverage would respond in these circumstances, the panel simply equated PIP and UM coverage, discerning no reason to distinguish between the two. However, as statutory enactments, we are bound by their plain language. And, by their own clear terms, the PIP and UM statutes are fundamentally different. As we have noted, the UM statute requires a two-prong test for coverage: an accident and a causal link between the

---

[4] We emphasize, however, that *Shaw* did not address the unique scope of UM coverage; its focus was on whether a driver's intentional act of trying to run down someone with a car was an " 'accident' ... within the meaning of [the driver's] uninsured motorist policy." *Supra,* 174 *N.J.* at 578, 811 *A.*2d 404.

accident and the uninsured vehicle. In contrast, the PIP statute provides that

> every standard automobile liability insurance policy ... shall contain personal injury protection benefits for the payment of benefits ... to the named insured and members of his family residing in his household who sustain bodily injury as a result of an accident while occupying, entering into, alighting from or using an automobile, or as a pedestrian, *caused by* an automobile or by *an object propelled by or from an automobile* [.]
>
> [*N.J.S.A.* 39:6A–4 (emphasis supplied).]

Specifically in the PIP context, this Court already has determined that, given the unique language of the PIP statute, a drive-by shooting victim is entitled to PIP benefits. *Lindstrom, supra,* 138 *N.J.* at 242, 649 *A.*2d 1272.

▆▆▆▆ We cannot so readily ignore the pointedly different language in the PIP statute—providing for PIP coverage for injuries "caused by ... an object propelled by or from an automobile"—that appears nowhere in the UM statute. That glaring difference renders these two statutes unlikely bedfellows. While the PIP statute's language specifically providing for coverage for injuries caused by objects propelled by or from an automobile encompasses a projectile discharged in a drive-by shooting, the reach of the UM statute is not nearly as broad. Both the UM statute, and the cases interpreting it, hold that there must be "a 'substantial nexus'—that is, a substantial connection or link—between the injury and the use of the vehicle in order for there to arise the obligation to provide coverage." *Sciascia, supra,* 183 *N.J.Super.* at 358, 443 *A.*2d 1118 (citing *Westchester Fire Ins. Co. v. Continental Ins. Cos.,* 126 *N.J.Super.* 29, 38, 312 *A.*2d 664 (App.Div.1973), *aff'd,* 65 *N.J.* 152, 319 *A.*2d 732 (1974)).[5] And, in

---

[5] Although the PIP statute also applies a "substantial nexus" test, *see, e.g., Lindstrom, supra,* it does so in determining whether an object has been propelled from an automobile. Specifically, *Lindstrom* "applie[s] the substantial-nexus test in the PIP-coverage context[,]" *supra,* 138 *N.J.* at 246, 649 *A.*2d 1272, in the specific circumstances where the use of the automobile was unquestioned. That said, *Lindstrom* "recognize[s] as well that [the PIP statute], however broad its protection for injuries substantially related to the use of an automobile, was not

similar circumstances, the Appellate Division repeatedly has concluded that there is no substantial nexus. *See, e.g., Vasil v. Zullo,* 238 *N.J.Super.* 572, 570 *A.*2d 464 (App.Div.1990) (holding that injuries of passenger who was stabbed in altercation with occupants of second car did not arise out of ownership, maintenance, operation or use of uninsured motor vehicle); *Cerullo v. Allstate Ins. Co.,* 236 *N.J.Super.* 372, 565 *A.*2d 1125 (App.Div.1989) (holding that bodily injury to motorist from assault by another motorist at intersection did not arise out of ownership, maintenance, operation or use of uninsured motor vehicle).

■ Even if one were to set aside the clear differences in language between the PIP statute and the UM statute, the different purposes those statutes are designed to serve also command different results. In enacting the PIP statute, "the Legislature's intent was to ensure 'the broadest coverage possible so long as an automobile was involved in that which happened.'" *Svenson v. Nat'l Consumer Ins. Co.,* 322 *N.J.Super.* 410, 416, 731 *A.*2d 91 (App.Div.1999) (quoting *Pa. Nat'l Mut. Cas. Ins. Co. v. Estate of Miller,* 185 *N.J.Super.* 183, 187, 447 *A.*2d 1344 (App.Div.1982)); *see also Morgan v. Prudential Ins. Co. of Am.,* 242 *N.J.Super.* 638, 642, 577 *A.*2d 1300 (App.Div.) (concluding that "the Legislature intended PIP coverage to provide some protection to people injured in automobile accidents regardless of fault, but did not intend that PIP coverage provide protection to people injured in accidents for which there would not have been automobile liability coverage even if fault could be established"), *certif. denied,* 122 *N.J.* 370, 585 *A.*2d 377 (1990).

■ In contrast, the reach of the UM statute is more limited. We have explained that the UM "statute has two purposes: to relieve the financial burden on the Unsatisfied Claim and Judgment Fund and to protect insured motorists from uninsured financially irresponsible drivers." *Lundy v. Aetna Cas. & Sur.*

---

designed to function as general crime insurance[,]" *ibid.,* a distinction we too draw in respect of uninsured motorist coverage.

*Co.*, 92 *N.J.* 550, 555, 458 *A.*2d 106 (1983); *see also Fernandez v. Selected Risks Ins. Co.*, 82 *N.J.* 236, 240, 412 *A.*2d 755 (1980) (same). That said, "the essential purpose of the [UM] legislation is to make the victim whole, but not provide a windfall or to allow a double recovery[.]" *Riccio v. Prudential Prop. & Cas. Ins. Co.*, 108 *N.J.* 493, 504, 531 *A.*2d 717 (1987). Even within that "essential purpose ... to make the victim whole," UM coverage is not without clear definition. For example, we have emphasized that "the objective of the [UM] legislation as we perceive it was to protect the public from a noninsured, financially irresponsible motorist, not one who is insufficiently insured." *Gorton v. Reliance Ins. Co.*, 77 *N.J.* 563, 572, 391 *A.*2d 1219 (1978).

▮ A comparison of these differing purposes yields the conclusion that the PIP statute and the UM statute, while part of the larger mosaic of New Jersey's mandatory automobile insurance coverage, are not mutual substitutes, but instead are designed to provide different coverages applicable to different circumstances. For those reasons, it ill fits to extrapolate coverage concepts from the broad coverage afforded by the PIP statute to the more tailored coverage provided under the UM statute.

In the end, it is the limited purpose of UM coverage—to provide insurance benefits to a covered person where the automobile that causes the harm is uninsured—that drives our conclusion that, in these circumstances, defendant cannot be called on to respond with UM coverage to plaintiff's benefit. Indeed, the concluding analysis of *Vasil, supra*, is entirely—and eerily—on point:

> Although the details of the [shooting] of [plaintiff] are unknown, the circumstances leave no doubt that [s]he was the victim of an assault by one or more of the occupants of the Toyota. If the perpetrators of the assault had been apprehended and the operation of the Toyota was covered by insurance, the standard policy exclusion for "intentional acts" would have precluded plaintiff from obtaining recovery from the insurer of the Toyota. *Since UM coverage is designed essentially as a substitute for the insurance coverage which the owner of an uninsured* or hit and run *vehicle would have been required to maintain, UM coverage does not extend to the [shooting] committed by one of the occupants of the Toyota.*
>
> [*Vasil, supra*, 238 *N.J.Super.* at 579, 570 *A.*2d 464 (emphasis supplied).]

*Accord Sciascia, supra,* 183 *N.J.Super.* at 359–59, 443 *A.*2d 1118 (explaining that "[t]he deliberate firing of a shotgun by the passenger ... from a moving vehicle, with the knowledge of—and participation and assistance by—the driver ... cannot be considered to have arisen out of the use of [the driver]'s vehicle" and that drive-by shooting "although unforeseen and unexpected by decedent insured, was not one which, in the contemplation of the parties to the UM contract, was a natural and probable incident or consequence of the use of an automobile by an uninsured motorist").

## IV.

The judgment of the Appellate Division is reversed and matter is remanded to the Law Division for reinstatement of the order granting defendant's summary judgment motion and dismissing plaintiff's complaint with prejudice.

JUSTICE WALLACE, JR., dissenting.

I respectfully dissent. I would affirm the judgment of the Appellate Division substantially for the reasons expressed by Judge Coburn. I add only the following brief comments.

The insurance policy provides that "[t]he bodily injury ... must be caused by an accident arising out of the ownership, maintenance or use of an uninsured motor vehicle." In *Lindstrom v. Hanover Ins. Co.,* 138 *N.J.* 242, 649 *A.*2d 1272 (1994), this Court addressed a similar issue in considering the plaintiff's claim for personal injury protection (PIP) benefits resulting from a gunshot wound inflicted in a drive-by shooting. The language of the PIP statute provided for benefits for bodily injury sustained " 'as a result of an accident ... as a pedestrian, caused by an automobile or by an object propelled by or from an automobile.' " *Id.* at 245, 649 *A.*2d 1272 (quoting *N.J.S.A.* 39:6A–4). In concluding that the plaintiff was entitled to PIP benefits, the Court declared that beyond the requirement of an object being propelled from an automobile,

the automobile did more than provide a setting or an enhanced opportunity for the assault. In addition to allowing the assailant to be at the place of attack, it furnished the assailant with what he must have assumed would be both anonymity and a means of escape. The assailant would not likely have committed such an act of apparently random violence without the use of a car.

[*Id.* at 252, 649 *A.*2d 1272.]

In *Shaw v. City of Jersey City*, 174 *N.J.* 567, 811 *A.*2d 404 (2002), the plaintiff police officer was injured when the driver of a car intentionally struck him. The plaintiff sought uninsured motorist benefits. This Court held that the driver's intentional act of hitting the police officer was an accident within the meaning of uninsured motorist coverage for injury caused by an accident. The Court discussed the purpose of UM coverage to provide maximum remedial protection to the innocent victims of financially irresponsible motorists and to relieve the troubled Unsatisfied Judgment Fund. The Court said that

whether the uninsured tortfeasor acted intentionally does not control the availability of uninsured motorist coverage, which pays benefits directly to the injured insured. The intentional acts of the tortfeasor are relevant only to justify a denial of third-party liability coverage under an intentional acts exclusion or clause of similar import in a liability policy applicable to the "uninsured motor vehicle."

[*Id.* at 575, 811 *A.*2d 404.]

The Court reasoned that "extending [UM] coverage irrespective of whether the insured's injury was caused by an intentional act maximizes the scope of the protection available under *N.J.S.A.* 17:28–1.1, thereby giving effect to its legislative intent." *Ibid.*

Based on our case law, in my view, the Appellate Division appropriately concluded that:

We perceive no principled basis in these circumstances, a random, drive-by shooting, for treating UM coverage differently from PIP coverage on the central question of whether there was a sufficient nexus between the use of the automobile and the injury. The role played by the automobile in this case is no different from the role it played in *Lindstrom*, and we perceive no basis for concluding that there would be any difference between the objectively-reasonable coverage expectations under either statute, particularly since both statutes are to be construed broadly, extending coverage whenever reasonable.

[*Livsey, supra,* 396 *N.J.Super.* at 377–78, 934 *A.*2d 61.]

The majority agrees that plaintiff's injury qualifies as an "accident" under the UM statute, but finds insufficient nexus between

the accident and the operation or use of an uninsured vehicle necessary to permit UM benefits to plaintiff. I cannot agree with that conclusion. The operation or use of the uninsured vehicle provided the "opportunity for the assault" and would not likely have occurred "without the use of a car." *Lindstrom, supra,* 138 *N.J.* at 252, 649 *A.*2d 1272. Consequently, I conclude that there was a sufficient nexus between the use of an automobile and the shooting for plaintiff to receive UM benefits.

Beyond that, under the majority's view, if plaintiff had been struck by a person in a car wielding a baseball bat, there would be UM benefits, but the firing of a weapon from that same vehicle does not permit justifying UM benefits. That is a difference that I do not understand. In my view, the result should be the same because in each case there is a sufficient nexus between the use of the vehicle and the injury to justify UM benefits.

JUSTICES LONG and ALBIN join in this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, RIVERA–SOTO and HOENS—4.

*For affirmance*—Justices LONG, ALBIN and WALLACE—3.